UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

MENCIANA B. MEIPPEN, Personal
Representative of the Estate of
Benites S. Sichiro, Deceased,

No. CV-07-220-FVS

        Plaintiff,

ORDER

        v.

SPOKANE COUNTY, et al.,

        Defendants.

**THIS MATTER** came before the Court on June 9, 2009, for resolution of two motions. The defendants were represented by Heather C. Yakely and Hugh T. Lackie. The plaintiff was represented by Greg M. Devlin and Brian G. Hipperson.

**BACKGROUND**

Benites Sichiro was arrested on January 26, 2006. He was booked into the Spokane County Jail late that evening. During the booking process, he interacted with several corrections officers. Deputy David Henderson thought he was intoxicated. Deputy Edward Petrie also smelled the odor of alcohol. In addition, he noticed that Mr. Sichiro had a black eye and swollen lips. Consequently, he left Mr. Sichiro in section 2 West of the Jail rather than placing him in the Jail's general population.

Between the evening of January 26th and the morning of January

ORDER - 1

29th, corrections officers observed Mr. Sichiro 110 times.  No one observed signs of Delirium Tremens ("DTs") until approximately 6:00 a.m. on January 29th.  At that time, Deputy David Hatton looked into Mr. Sichiro's cell.  He was sitting on the edge of his bunk -- shaking.  As a result, Deputy Hatton contacted Nurse Sharon Dunphy.  She went to Mr. Sichiro's cell.  He did not respond to her questions or permit her to check his vital signs.  Nevertheless, since it appeared to her that he was going through the DTs, she ordered a "DT protocol" and asked corrections officers to move him to a different cell for closer observation.

Deputy Theodore R. Tofsrud went to Mr. Sichiro's cell.  It was about 6:45 a.m.  He was joined by Sergeant Stephen L. Long.  Mr. Sichiro was sitting on his bunk.  He was talking to himself and placing small paperback books in his jumpsuit.  Sergeant Long told Mr. Sichiro to come to the door of the cell so that they could handcuff him.  He did not do so.  Sergeant Long and Deputy Tofsrud entered Mr. Sichiro's cell.  When they attempted to stand him up, he began to kick and fight.  Sergeant Long used a Taser to shock Mr. Sichiro.  This enabled Sergeant Long and Deputy Tofsrud to force Mr. Sichiro to the floor of the cell.  Sergeant Long controlled his left arm, but Deputy Tofsrud couldn't control his right arm.  Mr. Sichiro grabbed Deputy's Tofsrud's hand and would not let go.  Deputy Tofsrud twice struck Mr. Sichiro hand.  When that didn't work, he struck Mr. Sichiro's hand and lower back.  The blows are called "strikes."  They are a defensive tactic that corrections officers are taught to use in certain situations.  Sergeant Long again shocked Mr. Sichiro with a Taser.  By

ORDER - 2

this time, other corrections officers had arrived.  Deputy David Hatton grabbed Mr. Sichiro's legs.  Sergeant Long used the Taser for the third time.  After much effort, the corrections officers handcuffed Mr. Sichiro.  They stood him on his feet and escorted him out of his cell; at which point he began kicking.  Deputy Wayne Maurer and Deputy Petrie came to assist.  Mr. Sichiro resisted vigorously. It took five corrections officers -- Long, Tofsrud, Hatton, Maurer and Petrie -- to move him to the new cell.

Sergeant Long contacted Nurse Dunphy and informed her that he had shocked Mr. Sichiro several times.  It was now about 7:10 a.m.  Nurse Dunphy indicated that she wanted to examine Mr. Sichiro.  Sergeant Long sent two corrections officers -- Tim Christopherson and John Elam -- with her.  The two deputies entered the cell.  At first, he seemed to cooperate; then, all of a sudden, he began to fight.  Deputies Christopherson and Elam forced Mr. Sichiro to the floor of the cell by means of an arm bar.  He continued to struggle.  The deputies were amazed by his strength.  Deputy Christopherson struck Mr. Sichiro's left side with a hammer strike.  He aimed the blow at Mr. Sichiro's rib cage; but Sichiro rolled, so the blow hit his abdomen.  Mr. Sichiro attempted to bite Deputy Elam.  Elam kneed him twice in the upper rib cage in order to prevent him from doing so.  Deputy Hatton and Deputy Michael Vanatta entered the cell.  They grabbed Mr. Sichiro's legs.  Ultimately, the deputies were able to restrain him. Sergeant Long directed Deputies Christopherson and Elam to push Mr. Sichiro under his bed so the deputies could retreat safely from the cell.  There is a sharp dispute as to how Deputy Elam executed

Sergeant Long's order.  The plaintiff alleges Deputy Elam used a "donkey kick."  He denies her allegation.  He says he pushed -- not kicked, but pushed -- against Mr. Sichiro's shoulder with his foot. Once Mr. Sichiro was under his bunk, the corrections officers left his cell.

Nurse Dunphy and Deputy Hatton stayed to watch Mr. Sichiro. Within minutes, he got out from under his bed and climbed upon the desk.  He positioned himself as though he was planning to dive headfirst onto the concrete floor.  Deputy Hatton told him to get off of the desk.  He complied.  Nurse Dunphy asked the corrections officers to place Mr. Sichiro in a "safety cell" or a "restraint chair" so that he wouldn't harm himself.  No safety cells were available, so the officers' only option was a restraint chair.

Sergeant Long went to Mr. Sichiro's cell with Deputies Christopherson, Elam, Hatton, Vanatta, Mauer.  Deputies Todd Belitz and Matthew Milholland joined them; so did Nurse Dunphy.  Sergeant Long instructed Mr. Sichiro to put his hands out through the food slot so that the corrections officers could handcuff him.  He refused to obey this, and every other, command that Sergeant Long gave him. Instead, he sat down near the door of his cell.  The corrections officers opened the cell door.  Mr. Sichiro was still sitting on the floor, but he turned so that he could kick anyone who entered.  Deputy Elam and Sergeant Long were the first to go in.  Mr. Sichiro kicked at them from his seated position on the floor.  Then, he lashed out with his fists.  Deputy Elam grabbed Mr. Sichiro's left arm and rolled him onto his stomach, but couldn't control him.  Mr. Sichiro struck Deputy

ORDER - 4

Belitz, who then fired the Taser.  Mr. Sichiro pulled out one of the probes, and continued to fight fiercely.  While he was not a big man, he seemed to possess superhuman strength.  Again, Deputy Belitz shocked Mr. Sichiro with the Taser.  The deputies handcuffed Mr. Sichiro and maneuvered him toward the restraint chair.  He attempted to spit on the deputies.  They placed a spit net on him.  Even after he was seated in the restraint chair, he continued to fight.  So vigorous was his resistance that the deputies had trouble fastening the restraints.  Deputy Tofsrud shocked Mr. Sichiro with the Taser.  Eventually, the corrections officers were able to fasten all of the restraints.

All of a sudden, Mr. Sichiro went limp.  Deputy Elam asked Nurse Dunphy to check him.  He was not breathing.  Nor could Nurse Dunphy detect a pulse.  It was approximately 7:40 a.m.  Sergeant Long contacted the jail control room and asked an officer to summon an ambulance.  Deputy Milholland obtained the medical response bag.  Nurse Dunphy applied the defibrillator.  The deputies began cardiopulmonary resuscitation ("CPR").  Paramedics arrived and administered a heart stimulant.  At about 8:10, the paramedics left for a hospital.  Deputy Tofsrud rode in the ambulance.  Deputy Vanatta drove to the hospital in a separate vehicle.

The staff in the Emergency Room ("ER") began working on Mr. Sichiro.  Shortly before 11:00 a.m., the ER staff detected fluid in his abdomen.  At about 11:05, the Jail Commander called the hospital and advised the ER staff that deputies had kneed Mr. Sichiro in the abdomen as they attempted to control him.  The ER staff assembled a

ORDER - 5

trauma team.  Mr. Sichiro was taken into surgery, where he died at about 1:50 p.m. as a result of one-inch tear in his liver.

Mr. Sichiro was survived by Menciana B. Meippen and their two minor children.  Ms. Meippen was appointed as the personal representative of his estate.  She has filed an action against Spokane County and numerous individuals.  She seeks damages under 42 U.S.C. § 1983 and the law of the State of Washington.  The Court has original jurisdiction over her federal claims.  28 U.S.C. §§ 1331 and 1343(3). The Court may exercise supplemental jurisdiction over her state-law claims.  28 U.S.C. § 1367.  The defendants have filed a motion for summary judgment.  Fed.R.Civ.P. 56(b).

**PLAINTIFF'S MOTION TO STRIKE**

Pursuant to Local Rules 7.1(c) and 56.1(b), the plaintiff filed a number of items in opposition to the defendants' summary judgment motion.  Afterward, the defendants submitted a supplemental statement of material facts, an affidavit, and a reply.  The plaintiff alleges that the reply raises new issues and that the affidavit constitutes new evidence.  Consequently, she moves to strike the affidavit and parts of the defendants' reply.  As she points out, the Ninth Circuit rarely agrees to consider an issue that is raised for the first time in a reply brief.  *See, e.g., Bazuaye v. INS*, 79 F.3d 118, 120 (9th Cir.1996) (*per curiam*).  However, district courts are not bound by the Ninth Circuit rule.  Contrary to the plaintiff, district courts may consider issues that are raised for the first time in a reply.  *See, e.g., Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir.2008); *Glenn K. Jackson, Inc., v. Roe*, 273 F.3d 1192, 1202 (9th Cir.2001).

Nevertheless, the Court declines to do so.  The plaintiff's complaint gave the defendants adequate notice that she is alleging Nurse Dunphy and Spokane County were deliberately indifferent to Mr. Sichiro's medical needs.  Despite receiving notice, the defendants did not discuss the plaintiff's deliberate-indifference-to-medical-care claims in their opening memorandum.  For example, they did not attempt to show that Nurse Dunphy is entitled to qualified immunity.  Nor did they attempt to challenge the plaintiff's allegation that Spokane County had a policy of deliberate indifference to the medical needs of pretrial detainees who are suffering the effects of alcohol withdrawal.  Given those omissions, the plaintiff was entitled to assume that the defendants were not seeking summary judgment with respect to her deliberate-indifference-to-medical-care claims. Allowing the defendants to challenge those claims for their first time in their reply would place the plaintiff at an unfair disadvantage. Thus, the Court will not consider whether Nurse Dunphy is entitled to qualified immunity.  Nor will the Court consider whether Spokane County can be held liable under 42 U.S.C. § 1983 on the ground that it had a policy of deliberate indifference to Mr. Sichiro's medical needs.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The defendants seek summary judgment.  As amended in 2007, Rule 56(c) states, "[J]udgment . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."

ORDER – 7

A. "Doe" Defendants

The defendants move to dismiss all "Doe" defendants.  The plaintiff does not oppose their motion.  Nor could she.  It is too late for her to substitute named defendants for "Doe" defendants.  *Cf*. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 471 (4th Cir.2007) (en banc) ("[m]ost parties substituted for 'Doe' defendants would be protected against being added either because they were prejudiced or because they did not have proper notice").

B. Excessive Force

The plaintiff alleges the corrections officers subjected Mr. Sichiro to excessive force in violation of the Fourteenth Amendment.  The officers seek qualified immunity.  The plaintiff characterizes their request as an affirmative defense.  She is not entirely correct.  "Qualified immunity is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'"  *Scott v. Harris*, 550 U.S. 372, 376 n.2, 127 S.Ct. 1769, 1773 n.2, 167 L.Ed.2d 686 (2007) (emphasis in original) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)).  In *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), the Supreme Court adopted a two-step process for assessing a government official's request for qualified immunity.  A court's first task is to determine whether a rational jury could find that the official violated a constitutional right.  *Id.*  If not, the official is entitled to summary judgment.  *Id.*  Conversely, if a reasonable jury could find a constitutional violation, a court must complete a

second task.  *Id.*  It is to determine whether the constitutional right

was clearly established on the date the violation allegedly occurred.

*See id.*[1]

    *1. constitutional violation*

    The Court's first task is to determine whether a rational jury

could find that the corrections officers violated the Constitution.

In order to resolve this issue, the Court must consider the extent to

which pretrial detainees are protected from excessive force by

corrections officers.  Pursuant to the Due Process Clause of the

Fourteenth Amendment, a person who is held in state custody prior to

conviction is entitled to certain minimal conditions of confinement.

*Collins v. City of Harker Heights*, 503 U.S. 115, 127, 112 S.Ct. 1061,

1070, 117 L.Ed.2d 261 (1992).  For example, the custodian of a

pretrial detainee may not subject him to force that rises to the level

of punishment.  *Graham v. Connor*, 490 U.S. 386, 395 n.10, 109 S.Ct.

1865, 1871 n.10, 104 L.Ed.2d 443 (1989).  Although the Supreme Court

has not identified the point at which force becomes punishment, it has

suggested he answer is to be found in its Fourth Amendment

jurisprudence.  *Id.*  The Ninth Circuit has followed the Supreme

Court's suggestion; relying upon the Fourth Amendment to establish the

constitutional limits upon a corrections officer's use of force to

control a pretrial detainee.  *Pierce v. Multnomah County*, 76 F.3d

---

    [1]At one time, courts were required to complete the first
task before proceeding to the second.  *Pearson v. Callahan*, 555
U.S. ----, ----, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).
Although courts are no longer required to proceed in that manner,
*id.* at ----, 129 S.Ct. at 818, it makes sense to do so here.

ORDER - 9

1032, 1043 (9th Cir.1996), *cert. denied*, 519 U.S. 1006, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996).  Under the Fourth Amendment, the force used by a corrections officer must be objectively reasonable given the totality of the circumstances.  *See, e.g., Lolli v. County of Orange*, 351 F.3d 410, 415 (9th Cir.2003); *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1185, 1186 (9th Cir.2002), *cert. denied*, 537 U.S. 1106, 123 S.Ct. 872, 154 L.Ed.2d 775 (2003).  Determining whether force is objectively reasonable involves a balancing of the competing interests.  *Gregory v. County of Maui*, 523 F.3d 1103, 1106 (9th Cir.2008).  On the one hand, a court must consider the nature and magnitude of the force to which the detainee was subjected.  *See id.* On the other hand, a court must consider the officer's need to use force.  *See id.*

     The corrections officers engaged in three distinct struggles with Mr. Sichiro during a ninety-minute period on January 29, 2006.  Each struggle must be analyzed separately.[2]  The first struggle arose when Nurse Dunphy asked the corrections officers to move Mr. Sichiro to a different cell so that she could monitor his condition more closely. The corrections officers had no reason to doubt her determination that Mr. Sichiro was suffering from the DTs.  Nor did they have any reason to disobey her request to move him to a different cell.  *See Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir.2000) ("[p]lausible instructions from a superior . . . support qualified immunity where,

_____

     [2]The parties have not analyzed each officer's right to qualified immunity with respect to each struggle in which he participated.

ORDER - 10

viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists"). *See also Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir.2003); *Varrone v. Bilotti*, 123 F.3d 75, 82 (2d Cir.1997). Although the corrections officers knew Mr. Sichiro was suffering from the DTs, they did not know he would react violently when they touched him. Thus, their decision to move him to a different cell was not an intentional or reckless provocation. *See Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir.2002) ("where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force"). Once Mr. Sichiro began to resist, the corrections officers had to make a "split-second judgment[]" regarding the amount of force to use to control him; and they had to make their decision in a situation that was "tense, uncertain, and rapidly evolving[.]" *Graham*, 490 U.S. at 396-97, 109 S.Ct. at 1872. The officers used hand strikes and Taser shocks to subdue him. These may have constituted deadly force. *Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir.) (*en banc*) ("deadly force" is force that "creates a substantial risk of causing death or serious bodily injury"), *cert. denied*, 545 U.S. 1128, 125 S.Ct. 2938, 162 L.Ed.2d 866 (2005).[3]

---

[3]The parties have not discussed whether the officers used deadly force to control Mr. Sichiro. For now, the Court will assume they did. *Cf. Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir.1994) (discussing the use of pain compliance techniques).

ORDER - 11

Sergeant Long's use of a Taser during the first struggle set the stage for a second struggle.  After the corrections officers placed Mr. Sichiro in a new cell, Sergeant Long informed Nurse Dunphy that he had shocked Mr. Sichiro with a Taser.  She wanted to examine Mr. Sichiro in order to determine whether he needed medical care as a result of the shocks.  Her request created a dilemma for Sergeant Long.  On the one hand, he had a duty to help her address Mr. Sichiro's medical needs.  On the other hand, he had cause to be concerned that Mr. Sichiro would resist the examination.  Sergeant Long decided to send Deputies Christopherson and Elam with Nurse Dunphy.  They had no reason to question the legality of Sergeant Long's order.  Initially, they thought Mr. Sichiro would submit to an examination by Nurse Dunphy.  They were wrong.  All of a sudden, he began to fight.  Eventually, with help from other deputies, they overcame his resistance.  Once again, they may have utilized deadly force to subdue him.

Not long after the deputies left Mr. Sichiro's cell, he climbed up onto a desk in his cell and acted as though he intended to dive off the desk headfirst into the concrete floor.  Nurse Dunphy observed Mr. Sichiro's behavior.  While he climbed down from the desk when a corrections officer ordered him to do so, Nurse Dunphy was concerned that he intended to harm himself.  Consequently, she asked the corrections officers to place him in a safety cell or a restraint chair.  Once again, her request created a dilemma for Sergeant Long.  She, not he, was the medical professional on the scene; and he could see that there was an objective basis for her request.  At the same

time, Sergeant Long could be fairly confident Mr. Sichiro would resist
vigorously.  What was Sergeant Long to do?  He decided to place Mr.
Sichiro in a restraint chair since no safety cells were available.
Mr. Sichiro resisted fiercely.  As during the first and second
struggles, the corrections officers may have used deadly force to
control him.

It is clear, then, that the corrections officers struggled with
Mr. Sichiro on three occasions.  The first struggle occurred when
Nurse Dunphy asked them to move him to a new cell.  The second
struggle occurred when she decided to examine him.  The third struggle
occurred when she asked them to place him in a safety cell or a
restraint chair.  With one exception, the corrections officers concede
that genuine issues of material fact exist with respect to the
objective reasonableness of the force that they utilized during their
three struggles with Mr. Sichiro.  (Defendant's Reply Memorandum at 3-
4.[4])  In view of the officers' concession, the first step in the
*Saucier* process is complete.  The Court must assume that a rational
jury could find that the officers violated Mr. Sichiro's
constitutional right to be free from objectively unreasonable force.
Consequently, the Court now proceeds to the second step in the *Saucier*
process, which is to determine whether the corrections officers

---

[4]The exception is Deputy Elam's alleged kick.  (Defendants'
Memorandum in Support of Motion for Summary Judgment at 14.)
Despite the defendants' exception, a rational jury could accept
the plaintiff's interpretation of the event.  If the jury accepts
the plaintiff's interpretation, it could find that Deputy Elam
acted in an objectively unreasonable manner.

ORDER - 13

violated clearly established law.  *See Pearson*, 555 U.S. at ----, 129 S.Ct. at 822.

*2. clearly established law*

The plaintiff bears the burden of showing that Mr. Sichiro's right to be free from objectively unreasonable force was clearly established on January 29, 2006.  *See, e.g., Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir.2002); *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir.1998).  In order to carry her burden, she must show that the right was "'clearly established' in a . . . particularized . . . sense[.]"  *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156.  The Supreme Court has demonstrated how to conduct the inquiry in an excessive-force case.  *Brosseau v. Haugen*, 543 U.S. 194, 199-201, 125 S.Ct. 596, 599-600, 160 L.Ed.2d 583 (2004) (*per curiam*).  In *Brosseau*, a law enforcement officer shot a man who was attempting to avoid arrest by fleeing in a vehicle.  543 U.S. at 196-97, 125 S.Ct. at 598.  The man alleged the officer used excessive force in violation of the Fourth Amendment.  *Id.* at 197, 125 S.Ct. at 598.  The Supreme Court began its qualified-immunity analysis by identifying the critical decision that the officer had to make.  It was, said the Supreme Court, "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight."  *Id.* at 200, 125 S.Ct. at 600.  Having

ORDER - 14

identified the critical decision that the officer had to make, the Supreme Court then asked whether the officer should have known that she was violating the Fourth Amendment by shooting the fleeing driver given the circumstances that she faced. *Id.* at 200-01, 125 S.Ct. at 600. In order to answer that question, the Supreme Court examined several factually-similar cases. *Id.* Based upon its review of those cases, the Supreme Court concluded that the officer's "actions fell within the hazy border between excessive and acceptable force" and, thus, she was entitled to qualified immunity. *Id.* at 201, 125 S.Ct. at 600.

Like *Brosseau*, this case involves an allegation that a law enforcement officer used excessive force. Consequently, the Court will adhere to the analytic process set forth in *Brosseau*. The first step is to identify the critical decisions that the corrections officers had to make as they struggled with Mr. Sichiro. 543 U.S. at 200, 125 S.Ct. at 600. They confronted Mr. Sichiro three times during a 90-minute period. Each confrontation occurred as a result of a request by Nurse Dunphy. Her first request was that the corrections officers move Mr. Sichiro to a cell where she could better monitor his medical condition. When the officers went to his cell to move him, they did not know he would react violently; but he did. As a result, they had to make a split-second decision: whether to use deadly force to subdue a pretrial detainee who, because of the DTs, was violently resisting their efforts to carry out a medically legitimate request by a nurse. That was not the only critical decision the corrections officers had to make that morning. They also had to decide how to

respond to her second and third requests.  Her second request was to examine Mr. Sichiro after Sergeant Long shocked him with a Taser.  Her third request was to place him in a safety cell or a restraint chair. Both requests were medically legitimate.  The corrections officers would have been hard pressed to refuse either request.  And yet they knew that attempting to carry them out likely would produce a violent response by Mr. Sichiro.  Consequently, they had to make essentially the same decision in response to her second and third requests: whether to confront a pretrial detainee who, because of the DTs, is likely to violently resist efforts to carry out a medically legitimate request by a nurse.

The corrections officers concede that genuine issues of material fact exist with respect to whether the decisions that they made during the morning of January 29, 2006, deprived Mr. Sichiro of his right to be free from objectively unreasonable force.  Assuming, for purposes of the first step in the *Saucier* process, that the corrections officers violated the Constitution, the next step is to determine whether courts had provided clear enough guidance prior to January 29th so that the officers reasonably should have understood they were acting illegally by using deadly force to control Mr. Sichiro as they attempted to comply with Nurse Dunphy's requests.  *See Brosseau*, 543 U.S. at 200-01, 125 S.Ct. at 600.

The parties have devoted comparatively little attention to this part of the analytic process.  The plaintiff cites *Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir.2007), and  *Winterrowd v. Nelson*, 480 F.3d 1181 (9th Cir.2007), but both cases were decided after

ORDER - 16

January 29, 2006.  Thus, they could not have given fair notice to the corrections officers that their conduct was illegal.  *See, e.g., Brosseau*, 543 U.S. at 200 n.4, 125 S.Ct. at 600 n.4.  Which is not to say the corrections officers lacked guidance regarding the use of force.  Courts had established limits upon a law enforcement officer's authority to use force to control emotionally-disturbed persons.  By way of illustration only, the Ninth Circuit had ruled that a law enforcement officer may not use deadly force to subdue an emotionally-disturbed person who has not committed a serious offense, who does not pose a risk of flight, and who does not present a threat to the officer's safety or the safety of other persons.  *Deorle v. Rutherford*, 272 F.3d 1272, 1285-6 (9th Cir.2001), *cert. denied*, 536 U.S. 958, 122 S.Ct. 2660, 153 L.Ed.2d 835 (2002).  Again by way of illustration, the Ninth Circuit had ruled that a law enforcement officer may not subject an emotionally-disturbed person to deadly force once the officer has restrained him and he has stopped resisting.  *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060-62 (9th Cir.2003), *cert denied*, 542 U.S. 918, 124 S.Ct. 2871, 159 L.Ed.2d 775 (2004).  It is possible that the preceding cases are distinguishable; that they did not provide the corrections officers with fair notice that their actions were unconstitutional.  However, the corrections officers have not attempted to distinguish *Deorle* or *Drummond* or cases like them.  Instead, they have contented themselves with arguing that their actions were reasonable under the circumstances.  (Defendants' Reply Memorandum at 7-8.)  The type of qualified-immunity analysis that the corrections officers performed is an appropriate part of the

ORDER - 17

first step in the *Saucier* process, *see, e.g., Scott*, 550 U.S. at 383-86, 127 S.Ct. at 1778-79, but not the second step.  A different type of analysis is required when the inquiry is whether a government official violated clearly established law.  *Brosseau*, 543 U.S. at 200-01, 125 S.Ct. at 600.  *Cf. Pearson*, 555 U.S. at ----, 129 S.Ct. at 822 (analyzing consent-once-removed jurisprudence).  The corrections officers have not engaged in the type of analysis that the Supreme Court employed in *Brosseau*.  Thus, on the record as it now stands, the Court cannot say confidently that the corrections officers lacked fair notice that their conduct was illegal.  It follows that the officers are not entitled to qualified immunity with respect to the plaintiff's excessive-force claim.[5]

C. Failure to Intercede

Deputy Petrie seeks summary judgment on the plaintiff's claim(s) against him on the ground that his involvement in the effort to control Mr. Sichiro was too minimal to subject him to liability.  The plaintiff argues that Deputy Petrie's request is inappropriate.  To

___

[5]Even if the other corrections officers were entitled to qualified immunity with respect to this claim, it is unlikely that Deputy Elam would be.  If Deputy Elam gratuitously and maliciously kicked Mr. Sichiro, he arguably violated clearly established law.  *See Hudson v. McMillian*, 503 U.S. 1, 9-10, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992).  *But cf. Outlaw v. Newkirk*, 259 F.3d 833, 838 (7th Cir.2001) (noting that, in *Hudson*, the Supreme Court cautioned that "not every 'malevolent touch by a prison guard' gives rise to a federal cause of action, even if the use of force in question 'may later seem unnecessary in the peace of a judge's chambers'" (quoting *Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000)).

ORDER - 18

begin with, she argues that genuine issues of material fact exist with respect to the extent of his involvement.  In addition, she argues that even if he was not personally involved in acts of excessive force, he should have interceded on Mr. Sichiro's behalf.  As she notes, a law enforcement officer may be held liable for failing to intercede on behalf of a person who is being subjected to excessive force by other officers.  *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir.2000).  While the plaintiff is correct, she must prove at least two things in order to prevail on a failure-to-intercede claim.  For one thing, she must establish that Deputy Petrie had reason to know his fellow officers were subjecting Mr. Sichiro to excessive force.  *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir.2008).  For another thing, she must establish that Deputy Petrie had a realistic opportunity to intervene.  *Cunningham*, 229 F.3d at 1289.  *See also Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir.2005) (whether an officer had a realistic opportunity to intervene typically is a jury question).

For purposes of summary judgment, Deputy Petrie acknowledges that a rational jury could find that his fellow corrections officers subjected Mr. Sichiro to excessive force.  Deputy Petrie also acknowledges that he arrived during the course of the first struggle with Mr. Sichiro and that he helped carry him to his new cell.  Just when Deputy Petrie arrived during the course of the struggle is unclear.  Similarly, it is unclear what he saw or what his options were.  In view of the ambiguity, genuine issues of material fact exist with respect to whether Deputy Petrie had reason to know that his

fellow corrections officers were using excessive force, and, if he had reason to know, whether he had a realistic opportunity to intervene. As a result, he is not entitled to summary judgment on the plaintiff's failure-to-intercede claim.

D. Use of Force as Deliberate Indifference

The corrections officers knew Mr. Sichiro was suffering from the DTs. Given that knowledge, says the plaintiff, they had a duty to leave him alone until Nurse Dunphy could arrange for appropriate medical care. The plaintiff alleges they exhibited deliberate indifference to his need for medical care by using force -- any force -- to control him. In other words, the plaintiff alleges the corrections officers' use of force deprived him of substantive due process. *Lolli*, 351 F.3d at 418.

The corrections officers move to dismiss this claim. As they observe, "'*Graham* . . . requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043 (1998) (quoting *United States v. Lanier*, 520 U.S. 259, 272, n.7, 117 S.Ct. 1219, 1228, n.7, 137 L.Ed.2d 432 (1997)). In the officers' opinion, the plaintiff's allegation that their use of force was unconstitutional is covered by the Fourth Amendment standard. Thus, according to the officers, the plaintiff may not bring a parallel claim under the more general substantive due process standard.

ORDER - 20

Technically, a pretrial detainee's allegation that he was subjected to excessive force does not arise under the Fourth Amendment.  Instead, a pretrial detainee's excessive force claim arises under the Fourteenth Amendment, because it is the Fourteenth, not the Fourth, that protects a pretrial detainee from being subjected to excessive force by his custodian.  Nevertheless, the Ninth Circuit has held that a jailer's use of force is reviewed under the Fourth Amendment standard set forth in *Graham*.  *See, e.g., Gibson*, 290 F.3d at 1197.  Since there is a specific constitutional standard governing the corrections officers' use of force (*i.e.*, the *Graham* objective reasonableness standard), the plaintiff may not bring a parallel claim under the more general substantive due process standard.  Thus, the corrections officers are entitled to summary judgment on the plaintiff's allegation that their use of force amounted to deliberate indifference to Mr. Sichiro's need for medical care.

E. Conspiracy

The plaintiff alleges that Nurse Dunphy and the individual corrections officers conspired to deprive Mr. Sichiro of his Fourteenth Amendment right to medical care by agreeing to withhold information from paramedics and hospital staff regarding the full extent of the physical abuse to which he had been subjected in the Spokane County Jail.[6]  In order to avoid summary judgment, the plaintiff must identify evidence in the record establishing "(1) the

---

[6]At oral argument, the plaintiff explained that she is seeking relief under 42 U.S.C. § 1983, not 42 U.S.C. § 1985(3).  Thus, *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), is inapplicable.

ORDER - 21

existence of an express or implied agreement among [Nurse Dunphy and the corrections officers] to deprive [Mr. Sichiro] of his constitutional [right to medical care], and (2) an actual deprivation of [that right] resulting from that agreement." *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir.1991). *Accord Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir.1994); *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir.1988).

The plaintiff's position seems to be that, during the period between Mr. Sichiro's collapse and the arrival of the paramedics, Nurse Dunphy and the corrections officers agreed to withhold information concerning the events that had occurred during the preceding 90 minutes. However, the only evidence the plaintiff has offered in support of her conspiracy claim is that Nurse Dunphy and the corrections officers allegedly failed to provide sufficiently detailed information about Mr. Sichiro to the paramedics and the ER staff in order to enable them to accurately diagnose his injuries. Even if the plaintiff is correct in that regard, she has fallen well short of establishing a prima facie case of a conspiracy. To begin with, very little time elapsed between Mr. Sichiro's collapse and the arrival of the paramedics. Moreover, during that time, Nurse Dunphy and the corrections officers aggressively provided CPR. Finally, once the paramedics arrived, Nurse Dunphy explained that Mr. Sichiro had been shocked several times. Against the preceding undisputed facts, all the plaintiff can say is that, well, Nurse Dunphy and the corrections officers should have provided more information. Perhaps so, but their failure to do so does not rise to the level of prima

facie evidence of a conspiracy to violate Mr. Sichiro's civil rights.

The weakness of the plaintiff's conspiracy claim becomes all the more evident when one considers the events that occurred after the paramedics departed for the hospital.  Less than three hours later, the Jail Commander spoke with the ER staff.  He advised them Mr. Sichiro had been kneed in the abdomen.  The Jail Commander was not present during the struggles with Mr. Sichiro.  Thus, he could not have known Mr. Sichiro had been kneed unless someone communicated that information to him; someone who was familiar with what had occurred. The fact that fairly detailed information about the struggles with Mr. Sichiro flowed from corrections officers to the Jail Commander during the three-hour period after the paramedics left for the hospital undermines the plaintiff's allegation of a conspiracy of silence.

On the preceding undisputed facts, a rational jury would be unable to find for the plaintiff on her conspiracy claim.  Prior to arrival of the paramedics, Nurse Dunphy and the corrections officers aggressively provided CPR.  When the paramedics arrived, Nurse Dunphy informed them that Mr. Sichiro had been shocked, which appeared to account for his lack of a pulse.  After the paramedics left for the hospital, information flowed from the corrections officers to the Jail Commander.  Given the record as it now stands, a rational jury could not find that Nurse Dunphy and the corrections officers agreed to withhold information.  They are entitled to summary judgment on the plaintiff's conspiracy claim.

F. County Liability

The plaintiff is relying upon a number of theories in order to

establish that Spokane County is liable for damages under 42 U.S.C. §
1983.  The defendants challenged two of her theories in their opening
memorandum.  One theory is that the Sheriff failed to adequately train
his deputies regarding the type and amount of force they may use to
control a pretrial detainee who is suffering from the DTs.  Another
theory is that he failed to enforce his use-of-force policies.

*1. training*

A county may be held liable under § 1983 for failing to train its
employees.  *Board of County Commissioners of Bryan County, Oklahoma v.
Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997)
(hereinafter "*Bryan County*").  However, liability arises only where
the county's failure to establish an adequate training program
reflects deliberate indifference to the constitutional rights of its
citizens.  *City of Canton v. Harris*, 489 U.S. 378, 392, 109 S.Ct.
1197, 1206, 103 L.Ed.2d 412 (1989) (hereinafter "*Canton*").  Where, as
here, a county has established a program of training, one must begin
by examining the results of the training program.  *Bryan County*, 520
U.S. at 407, 117 S.Ct. at 1390.  "If a program does not prevent
constitutional violations, . . . decisionmakers may eventually be put
on notice that a new program is called for.  Their continued adherence
to an approach that they know or should know has failed to prevent
tortious conduct by employees may establish the conscious disregard
for the consequences of their action -- the deliberate indifference --
necessary to trigger [local government] liability."  *Id.* (internal
punctuation and citations omitted).  Here, there is no evidence that
corrections officers routinely subjected detainees to excessive force

prior to January 29, 2006.  If, in fact, the corrections officers used excessive force on that date, it was an isolated incident.  Thus, the plaintiff may not rely upon a pattern of constitutional violations in order to establish that the Sheriff knew or should have known that the corrections officers needed additional training.

This does not mean Spokane County may escape liability under § 1983 simply because Mr. Sichiro's death was an isolated incident.  In *Canton*, the Supreme Court "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability."  *Bryan County*, 520 U.S. at 409, 117 S.Ct. at 1391 (citing *Canton*, 489 U.S. at 390 n.10, 109 S.Ct. at 1205 n.10).  When might such a situation arise?  Justice White provided an example in *Canton*:

> "[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers in the constitutional limitations on the use of deadly force, *see Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Canton*, 489 U.S. at 390 n.10, 109 S.Ct. at 1205 n.10.

While a single violation of a person's constitutional rights can reflect deliberate indifference on a county's part, it is important to note, as Justice O'Connor did in *Bryan County*, that this will occur only in "a narrow range of circumstances."  520 U.S. at 409, 117 S.Ct.

ORDER - 25

at 1391.  In order to establish that this case falls within the "narrow range" described by Justice O'Connor, the plaintiff must present evidence from which a rational jury could find that Mr. Sichiro's death was "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.*  This is a three-part requirement.  First, the plaintiff must show that violent resistance by persons suffering from the DTs is a recurring situation in the Spokane County Jail.  Second, she must show that the corrections officers lacked specific tools which they needed in order to cope with violent resistance by Mr. Sichiro without using excessive force.  Third, she must show that their alleged use of objectively unreasonable force was a highly predictable consequence of the Sheriff's failure to train them adequately.

Although the plaintiff will bear the ultimate burden of persuasion at trial, it is Spokane County which is moving for summary judgment.  Thus, it is the County which bears the initial burden of production at this stage in the proceedings.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies*, Inc., 210 F.3d 1099, 1102 (9th Cir.2000).  The County "must either produce evidence negating an essential element of the nonmoving party's claim . . . or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* The Court has carefully reviewed the County's memoranda.  Neither memo discusses whether Mr. Sichiro's death was a highly predictable consequence of the Sheriff's failure to equip the corrections officers

with specific tools which they needed in order to handle a recurring situation without resorting to excessive force.  Consequently, the County has failed carry its initial burden of production under Rule 56.  The County is not entitled to summary judgment on the plaintiff's failure-to-train theory.[7]

   *2. supervision*

   The plaintiff alleges that Deputy Elam kicked Mr. Sichiro during the second struggle.  The plaintiff argues that Spokane County may be held liable for the allegedly unconstitutional kick because the Sheriff failed to enforce his use-of-force policies.  The plaintiff might be correct if the Sheriff had repeatedly failed to discipline deputies who utilized excessive force.  *See, e.g., Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir.1991).  However, there is no

------

[7]The plaintiff seems to concede that the use-of-force training provided by the Sheriff was appropriate as far as it went.  The problem, says the plaintiff, is that the training did not go far enough.  According to the plaintiff, the Sheriff did not provide tools which the corrections officers needed in order to respond appropriately to pretrial detainees who were suffering from the DTs.  Since the plaintiff is alleging that the Sheriff failed to adequately train his corrections officers to respond appropriately in a specific situation (*viz.*, coping with violent resistance by a pretrial detainee who is suffering from the DTs), the plaintiff will have to prove at trial that this specific situation was a recurring situation.  It will not be enough for her to show that pretrial detainees are violent from time to time.  She will have to prove that corrections officers regularly have to cope with pretrial detainees who are violent because they are suffering from the DTs, and that corrections officers lack specific tools which they need in order to cope appropriately.

such evidence in the record.  Spokane County is entitled to summary judgment on the plaintiff's failure-to-supervise claim.

G. Equal Protection

The plaintiff alleges that Nurse Dunphy and the corrections officers deprived Mr. Sichiro of the equal protection of the laws in violation of the Fourteenth Amendment.  In order to avoid summary judgment, the plaintiff must present evidence from which a rational jury could find that they intended to discriminate against Mr. Sichiro based upon his membership in a protected class.  *See Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir.2003).  However, the plaintiff has failed to identify any such evidence.  Absent evidence that Nurse Dunphy's and the corrections officers' actions were motivated by Mr. Sichiro's race or national origin (and no such evidence has been identified by the plaintiff), her equal protection claim fails.  Nurse Dunphy and the officers are entitled to summary judgment on her equal protection claim.

H. Children

Children have a constitutionally-protected liberty interest in the companionship of their father.  *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir.1991).  Mr. Sichiro's children allege the corrections officers deprived them of that interest without due process of law in violation of the Fourteenth Amendment.  The Ninth Circuit recognizes the type of claim asserted by Mr. Sichiro's children; sometimes referring to it as a "familial association claim." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir.2008).

In order to prevail on their familial-association claim, Mr.

ORDER - 28

Sichiro's children must prove the corrections officers engaged in conduct that shocks the conscience. *Id.* Whether the children can satisfy that requirement depends, to a large extent, upon which standard they must satisfy. There are two potentially-applicable standards. The less demanding standard is the deliberate-indifference standard. *Id.* It applies when a government official has an extended opportunity to consider his options, and he nonetheless acts in a manner which indicates that he doesn't care whether his conduct is unconstitutional. *Id.* at 1139 (punctuation and citation omitted). In such situations, the official's indifference is said to be conscience-shocking. *Id.* (punctuation and citation omitted). The more demanding standard is the purpose-to-harm standard. *Id.* at 1137. It applies when a government official, typically a law enforcement officer, has to weigh competing interests and make a decision in circumstances that allow little or no time for deliberation. *Id.* at 1139.

When it comes to determining which standard applies in this instance, the critical consideration is whether the corrections officers had an opportunity for actual deliberation. *Id.* at 1138. As a general rule, an officer does not have an opportunity for actual deliberation when he is confronted with "an evolving set of circumstances that [take] place over a short period necessitating fast action and presenting obligations that tend to tug against each other." *Id.* at 1139 (alteration added; internal punctuation and citation omitted). This may be such a case. If it is, Mr. Sichiro's children must present evidence from which a rational jury could find that the corrections officers acted with a purpose to harm him that

was unrelated to legitimate law enforcement objectives.  *Id.* at 1137.
However, on the record as it now stands, the Court cannot be sure the
purpose-to-harm standard is the correct one.  If the corrections
officers had time for actual deliberation, then Mr. Sichiro's children
could prove their familial association claim through evidence that the
officers were deliberately indifferent to his right to be free from
excessive force.  Consequently, the corrections officers are not
entitled to summary judgment on this claim.

**CONCLUSION**

A. Plaintiff's Motion to Strike

The Court grants two parts of the plaintiff's motion to strike.
The Court will not consider Nurse Dunphy's request for qualified
immunity.  Nor will the Court consider Spokane County's request for
summary judgment with respect to the plaintiff's deliberate-
indifference-to-medical-care claim.

B. Defendants' Summary Judgment Motion

The Court grants in part and denies in part the defendants'
motion for summary judgment.  The Court **grants** (1) the defendants'
request to dismiss the "Doe" defendants, (2) the corrections officers'
request to dismiss the plaintiff's allegation that they were
deliberately indifferent to Mr. Sichiro's need for medical care by
using force to subdue him, (3) Nurse Dunphy's and the corrections
officers' request to dismiss the plaintiff's conspiracy claim, (4)
Spokane County's request to dismiss the plaintiff's allegation that
the Sheriff failed to enforce his use-of-force policies, and (5) Nurse
Dunphy's and the corrections officers' request to dismiss the

plaintiff's equal protection claim.  The Court **denies** (1) the corrections officers' respective requests for qualified immunity with respect to the plaintiff's allegation that they used objectively unreasonable force in subduing Mr. Sichiro, (2) Deputy Petrie's request to dismiss the plaintiff's failure-to-intercede claim, (3) Spokane County's request to dismiss the plaintiff's allegation that the Sheriff failed to adequately train his deputies concerning the amount of force that they may use to control a pretrial detainee who is suffering from the DTs, and (4) the corrections officers' request to dismiss the children's familial association claim.

**IT IS HEREBY ORDERED:**

A. The defendants' motion for summary judgment (**Ct. Rec. 76**) is granted in part:

1. All claims against the "Doe" defendants are dismissed with prejudice.

2. The following claims against the corrections officers are dismissed with prejudice:

(a) the claim that they were deliberately indifferent to Mr. Sichiro's need for medical care by using force to subdue him;

(b) the claim that they conspired with Nurse Dunphy to withhold information concerning the force to which Mr. Sichiro was subjected; and

(c) the claim that they deprived Mr. Sichiro of the equal protection of the law.

3. The following claims against Nurse Dunphy are dismissed with prejudice:

ORDER - 31

(a) the claim that she conspired with the corrections officers to withhold information concerning the force to which Mr. Sichiro was subjected; and

(b) the claim that she deprived Mr. Sichiro of the equal protection of the law.

4. The following claim against Spokane County and former Sheriff Sterk is dismissed with prejudice:

(a) the claim that former Sheriff Sterk failed to enforce his use-of-force policies.

B. The plaintiff's motion to strike (**Ct. Rec. 155**) is granted in part.

C. The plaintiff's motion for reconsideration (**Ct. Rec. 184**) is denied as moot.

D. The plaintiff's motion to expedite (**Ct. Rec. 187**) is denied.

**IT IS SO ORDERED.**   The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

**DATED** this   25th   day of June, 2009.


            s/ Fred Van Sickle
               Fred Van Sickle
        Senior United States District Judge